FILED
2014 Jun-16  AM 11:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **PATRICIARINE THOMAS, as Administrator Ad Litem of the Estate of John Carter Thomas, deceased,** ] ] ] ] | |
| **Plaintiff,** ] | **CASE NO. 1:12-CV-02105-KOB** |
| ] | |
| **v.** ] | |
| ] | |
| **NICK STEKETEE, et al.,** ] | |
| ] | |
| **Defendants.** ] | |

<u>**MEMORANDUM OPINION**</u>

This matter comes before the court on Defendants' Motion for Summary Judgment. (Doc. 26). Plaintiff Patriciarine Thomas, the administrator ad litem of the Estate of John Carter Thomas, deceased, brings this § 1983, § 1985 and state law suit against Defendants Nick Steketee and the City of Anniston, Alabama; she alleges that constitutional violations occurred during the course of Mr. Thomas's arrest in June 2010. Defendants move for summary judgment, arguing that no disputes of material fact exist and that Defendants are entitled to judgment as a matter of law. For the following reasons, the court will DISMISS WITHOUT PREJUDICE Plaintiff's state law claims. The court finds that Defendants' motion for summary judgment is due to be GRANTED as to Plaintiff's federal claims. The court will ENTER JUDGMENT in favor of Defendants on Plaintiff's § 1983 and § 1985 claims.

**I.      STANDARD OF REVIEW**

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary

judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).   In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

2

475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its]

own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324

(quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963

Amendment of Fed. R. Civ. P. 56(e) ("The very mission of summary judgment procedure is to

pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

trial.").  The moving party need not present evidence in a form admissible at trial; "however, he

may not merely rest on [the] pleadings." *Celotex*, 477 U.S. at 324.  If the evidence is "merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477

U.S. at 249–50 (citations omitted).

      In reviewing the evidence submitted, the court must "view the evidence presented

through the prism of the substantive evidentiary burden," to determine whether the nonmoving

party presented sufficient evidence on which a jury could reasonably find for the nonmoving

party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir.

1988).  The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  "Even if a district court

'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant

summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707

F.3d 1244, 1252 (11th Cir. 2013)  (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir.

2006)). The court should not disregard self-serving statements made in sworn testimony simply

because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

## II.   PROCEDURAL HISTORY

Mr. John Carter Thomas filed his complaint on June 8, 2012. (Doc. 1). On September 27, 2012, the court received notice of Mr. Thomas's death (doc. 8), and on October 29, 2012, the court stayed the case pending the opening of Mr. Thomas's estate (doc. 14). On March 4, 2013, the court granted a motion to substitute Patriciarine Thomas, the Administrator Ad Litem of the Estate of John Carter Thomas, as the real party in interest and lifted the stay. (Doc. 18). The court entered a Scheduling Order imposing an end of discovery deadline of January 31, 2014. (Doc. 22).

On November 12, 2013, a little over two months before the end of discovery, Defendants filed their motion for summary sudgment. (Doc. 26). The court set a briefing schedule and on November 27, 2013, Plaintiff filed a motion for extension of time to respond. (Doc. 30). In the motion, Plaintiff requested ten extra days to respond to the motion for summary judgment, citing

the death of the original Plaintiff and the current Plaintiff's lack of first hand knowledge of the facts of the case. Plaintiff did not, however, invoke Rule 56(d) or in any way indicate to the court that she needed more time to complete discovery.

On December 13, 2013, Plaintiff filed her response to the motion for summary judgment. (Doc. 33). In her response and its supporting memorandum, Plaintiff noted that a number of Defendant's facts were "disputed." (Doc. 35). However, rather than complying with the requirement that she include "a specific reference to those portions of the evidentiary record upon which [any] dispute is based," (Appendix II, at 5), Plaintiff simply stated: "Plaintiff has insufficient facts to respond" (doc. 35). Plaintiff proceeded to argue the merits of the motion, again failing to ask for a deferral of the motion under Rule 56(d)(1) or for more time for discovery under Rule 56(d)(2).

According to Appendix II, "[*a*]*ll material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment*." (Appendix II, at 5). Plaintiff did not dispute a single one of Defendants' facts with a specific reference to the record. As such, the court will deem admitted any of Defendants' facts that are supported by Defendants' reference to the record. Likewise, because Defendants did not respond to Plaintiff's Additional Undisputed Facts, the court will deem those facts admitted as well. (Doc. 35).

## III.   FACTUAL HISTORY

Defendant Nick Steketee served as a police officer for the City of Anniston Police Department ("APD"). Officer Steketee was on duty on the evening of June 5, 2010. Just before 5:42 p.m., while on patrol, Office Steketee observed Mr. John Carter Thomas looking into the

5

broken windows and pulling on the bars of a vacant building at Fourth Street and Glen Addie

Avenue. Because Mr. Thomas appeared to be attempting to get into the building, Officer

Steketee continued to watch him. (Doc. 27-6). Unbeknownst to Officer Steketee, Mr. Thomas

was looking at the building because he was interested in buying it. (Doc. 34, ¶ 3). Mr. Thomas

later admitted that he did not own the building. (Doc. 24).

Although no cars were behind Officer Steketee's patrol car, Mr. Thomas yelled "you are

holding up traffic" and "I know my rights" and "I wasn't doing anything illegal" as he

approached and walked around the patrol car. Officer Steketee got out of the car and Mr. Thomas

charged up to him in an aggressive manner stating: "You can't just stop me in the street, I know

my rights!" According to Officer Steketee, Mr. Thomas's hands were shaking, his chest was

puffed out, and he appeared angry. Furthermore, Officer Steketee thought that Mr. Thomas might

be mentally unstable because he was talking very fast and using words in his sentences that did

not fit together correctly. (Doc. 27-6).

Mr. Thomas approached within three inches of Officer Steketee's face. Fearing attack,

Officer Steketee pushed him away, stating: "You don't walk up on an officer like that, stay

back." Mr. Thomas again stepped toward Officer Steketee, stating: "You didn't have to push

me." Officer Steketee grabbed Mr. Thomas's right arm and pushed him against the patrol car,

yelling: "Don't you ever walk up on a police officer like that. We take that as a physical threat."

Officer Steketee ordered Mr. Thomas to spread out his legs and hands, put one hand on Mr.

Thomas's back and his hip into Mr. Thomas's hip, and proceeded to pat Mr. Thomas down for

weapons. Mr. Thomas did not have any weapons. (Doc. 27-6). Beyond these actions, Mr.

Thomas never had an actual altercation with Officer Steketee. (Doc. 34, ¶ 32).

6

Because Mr. Thomas calmed down and began to talk more slowly, Officer Steketee released him, believing he no longer posed a threat. Officer Steketee turned on his VidMic, a digital audio/video recorder affixed to the front of his uniform. (Doc. 27-6). The audio/video shows Officer Steketee repeatedly telling Mr. Thomas that he should not have walked within an inch of his face because it was threatening. (Doc. 24).

Mr. Thomas gave Officer Steketee his driver's license and told Officer Steketee that his name was John Carter Thomas. (Doc. 34, ¶ 33). Officer Steketee read Mr. Thomas's license number to the dispatcher, but did not report his name or date of birth. (Doc. 34, ¶ 13). Officer Steketee correctly read Mr. Thomas's license number as "Alabama 8367854"; however, the dispatcher apparently misheard. A few minutes later the dispatcher told Officer Steketee that a "warrant check on *Jones Lewis* show a possible through Etowah County."  (Doc. 24) (emphasis added). Officer Steketee proceeded to ask Mr. Thomas if he knew he had a warrant in Etowah County. Mr. Thomas responded that he did not live in Etowah County and that Officer Steketee had the wrong John Thomas. (Doc. 24).

Officer Steketee handcuffed Mr. Thomas and told him he was being detained until the dispatcher confirmed the warrant. Mr. Thomas followed these commands. (Doc. 34, ¶ 17). Officer Steketee thanked Mr. Thomas for his compliance and stated: "We'll get this cleared up in a second and if its not you we'll cut you loose." (Doc. 24). As Officer Steketee put the handcuffs on Mr. Thomas, Mr. Thomas told Officer Steketee that he had heart trouble and did not want the handcuffs to be tight. Officer Steketee adjusted the handcuffs so they could not tighten. (Doc. 34, ¶ 19).

Mr. Thomas continued to assert that "there are a lot of John Thomases" and Officer

7

Steketee responded that he did not tell the dispatcher a name, but only gave him the license number. (Doc. 24). Mr. Thomas repeatedly told Officer Steketee that he had the wrong person and that the incident was a false arrest. (Doc. 24, ¶ 34). Approximately four minutes after Officer Steketee handcuffed Mr. Thomas, the dispatcher told Officer Steketee that the warrant had been confirmed. The dispatcher did not specify who was the subject of the warrant at that time. (Doc. 24).

Officer Steketee placed Mr. Thomas under arrest and put him in the patrol car to deliver him to officers from the Gadsden Police Department. While Officer Steketee was transferring Mr. Thomas, Mr. Thomas again asserted that they had the wrong person and asked Officer Steketee to check again. (Doc. 34, ¶¶ 22, 24).

At Mr. Thomas's request, Officer Steketee called the dispatcher on his cell phone and asked the dispatcher if the information was correct. The dispatcher stated that he checked number "I367854." Realizing that the number "8" had been mistakenly replaced with the letter "I", Officer Steketee had the dispatcher run the correct number and found out that no arrest warrants existed for Mr. Thomas. Officer Steketee returned Mr. Thomas to the site of arrest, apologized for the mistaken identity, and advised Mr. Thomas not to charge at police officers. (Doc. 27-6).

At 7:07 p.m. that same evening, Mr. Thomas called the APD to make a citizen's complaint against Officer Steketee. Officer Fred Forsythe took the call and helped Mr. Thomas prepare his complaint. Mr. Thomas told Officer Forsythe that he had "walked up into [Officer Steketee]." (Doc. 27-5).

The next day, Officer Forsythe ordered Sergeant Glen Pettus to conduct an internal investigation. Sergeant Pettus reviewed Officer Steketee's report, the VidMic audio/video, and

8

the audio between Officer Steketee and the dispatcher and then called Mr. Thomas. Mr. Thomas told Sergeant Pettus that he approached Officer Steketee before Officer Steketee could get to him, but that if Officer Steketee had felt threatened he should have "stepped back and to the right." Mr. Thomas also accused Officer Steketee of being rude and stated that the APD was prejudiced. Sergeant Pettus apologized for the "mix up" concerning the warrant and Mr. Thomas's arrest, and assured Mr. Thomas that he would address the rudeness issue with Officer Steketee. (Doc. 27-8).

## IV.   DISCUSSION

Because the three counts of Plaintiff's complaint each include claims under both federal and state law, the court will organize this evaluation by the various laws invoked, rather than by count.

### A.   Section 1983 Claims

#### i.   Section 1983 Claims against Officer Steketee

##### a.   Assault and Battery

Plaintiff alleges in Count One that Officer Steketee assaulted and battered Mr. Thomas without consent or probable cause. (Doc. 1). Defendants argue that no constitutional violation occurred during the encounter between Officer Steketee and Mr. Thomas. (Doc. 28). Although Plaintiff's complaint does not actually plead this claim as a Fourth Amendment excessive force violation, because both parties analyze it under that framework in the briefs, the court will do so as well.  The complaint also does not allege what actions Officer Steketee took to assault and batter Mr. Thomas; however, based on the record in the case—provided by the Defendants—the court will examine Officer Steketee's use of force in pushing Mr. Thomas away and then

grabbing his arm and pushing him against the patrol car as the alleged assault and battery.

The Fourth Amendment provides the right to be "free from excessive force in the course of an investigatory stop or other 'seizure' of the person." *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). To establish an excessive force claim, a plaintiff must first show he was "seized" within the meaning of the Fourth Amendment. *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). A Fourth Amendment seizure occurs when "there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in original).

Once a plaintiff establishes that a seizure occurred, the next inquiry is "whether the force used to effectuate the seizure was reasonable." *Beshers*, 495 F.3d at 1266. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger*, 381 F.3d at 1248 (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (internal quotation marks omitted).

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Thus, determining "whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment

interests' against the countervailing governmental interests at stake." *Id*. (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  The Supreme Court has concluded that this "careful balancing" requires the court to consider such factors as the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

Looking at the facts of this case, Officer Steketee seized Mr. Thomas when he laid his hands on him by pushing him away and, ultimately, pushing him to the hood of the patrol car. *See California v. Hodari D*., 499 U.S. 621 (1991) (finding that an individual, even if not previously seized, is seized once the officer makes physical contact with him). Therefore, the key determination for the court is whether the force used was reasonable under the circumstances; i.e., whether Officer Steketee was justified in pushing Mr. Thomas back away from him, grabbing his arm, and pushing Mr. Thomas to the hood of the patrol car. Although it turned out that Mr. Thomas did not have a weapon and may not have been a danger to Officer Steketee, the law recognizes that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Furthermore, the immediate threat to the safety of an officer is one of the factors the court must consider in balancing Mr. Thomas's Fourth Amendment interests with the countervailing government interests.

The uncontroverted evidence shows that Mr. Thomas approached Officer Steketee, that Mr. Thomas verbalized his aggravation with Officer Steketee, and that Mr. Thomas confronted Officer Steketee by charging very close to his face. Under these circumstances, the court finds that Officer Steketee was justified in pushing Mr. Thomas away and then forcing him into a

11

position where Officer Steketee could search him for weapons and neutralize any potential threat.
After all, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a
judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal
quotations omitted). Plaintiff does not even allege that Mr. Thomas suffered any actual physical
injury as a result of the pushing or demonstrate how this use of force was "excessive." Thus, the
court will GRANT summary judgment for the Defendants as to Plaintiff's § 1983 "assault and
battery" claim against Officer Steketee.

As an alternative ruling, the court also finds that, if Officer Steketee's actions did rise to
the level of a constitutional violation, Officer Steketee was acting within the scope of his
discretionary authority; he did not violate a clearly established right; and his actions were not
willful, malicious, fraudulent, in bad faith, beyond his authority, or made under a mistaken
interpretation of the law; therefore, he is entitled to qualified immunity as to this claim. *See Hope
v. Pelzer*, 536 U.S. 730, 739 (2002).

### b.    False Imprisonment

Plaintiff next alleges in Count Two that Officer Steketee falsely imprisoned Mr. Thomas.
(Doc. 1). Defendants do not address false imprisonment directly, but argue that no constitutional
violation occurred during the encounter between Officer Steketee and Mr. Thomas. (Doc. 28).
Again, Plaintiff fails to identify the statute or constitutional provision on which this claim is
based.

The Eleventh Circuit has held that a "false imprisonment claim under section 1983 is
based on the protection of the Fourteenth Amendment against deprivations of liberty without due
process of law." *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996). A false imprisonment

12

claim can arise based on a detention pursuant to an arrest where the police officer lacked

probably cause to make the arrest, or, under certain circumstances, can arise based on a detention

following a valid arrest "where the detainee protests the detention on the basis of

misidentification." *Id.*

To establish a § 1983 false imprisonment claim, a plaintiff must prove the elements of

common law false imprisonment and show that the imprisonment resulted in a violation of due

process rights under the Fourteenth Amendment. *Ortega*, 85 F.3d at 1526. The elements of

common law false imprisonment are "(1) intent to confine, (2) acts resulting in confinement, and

(3) consciousness of the victim of confinement or resulting in harm." *Id.* at 1526 n. 2. "[I]n cases

dealing with prisoners and other persons in state custody," the plaintiff must show deliberate

indifference "to establish a violation of substantive due process rights protected by the fourteenth

amendment." *Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir. 1993).

Prior to the time Officer Steketee actually placed Mr. Thomas under arrest based on the

existing warrant, Mr. Thomas was merely the subject of a *Terry*[1] stop, even while in handcuffs.

Officer Steketee specifically communicated to Mr. Thomas that the handcuffs were not intended

to place him under arrest but were a safety precaution that was necessary because of the threat

that Mr. Thomas's aggressive behavior posed. The court finds that the handcuffs were a

reasonable precaution given the potential threat Mr. Thomas posed and did not escalate the *Terry*

stop to an arrest at that point. *See U.S. v. Hastamorir*, 881 F.2d 1551, 1556-57 (11th Cir. 1989)

(finding that the handcuffing of the subject of a *Terry* stop did not convert the stop to an arrest

because the officers "reasonably believed that the men presented a potential threat to their

---

[1]*See Terry v. Ohio*, 392 U.S. 1 (1968).

13

safety"). Therefore, although Mr. Thomas was intentionally and consciously confined when handcuffed prior to his arrest, the stop did not result in the violation of due process rights necessary for a § 1983 false imprisonment claim. *See Ortega*, 85 F.3d at 1526.

The court finds that Officer Steketee had the reasonable suspicion necessary to conduct a *Terry* stop because of Mr. Thomas's trespass on and suspicious behavior around the abandoned building, because of Mr. Thomas's charge at Officer Steketee, and, later, because of the potential arrest warrant that Officer Steketee thought existed for Mr. Thomas. *See U.S. v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000) ("Under *Terry*, law enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity.").

At the next stage of the encounter, Officer Stekette placed Mr. Thomas under arrest after having received confirmation of the arrest warrant. Although the dispatcher did state that the arrest warrant was for "Jones Lewis," both Officer Steketee and Mr. Thomas misheard the dispatcher, an unsurprising result given the fuzzy nature of the communication. Furthermore, Officer Steketee's later actions indicate that the mistake was an honest one that he remedied as soon as he learned of it and not a mistake of deliberate indifference. *See Cannon*, 1 F.3d at 1563. Because Officer Steketee reasonably believed that a valid arrest warrant existed for Mr. Thomas, he had probable cause to place him under arrest. In light of this probable cause, Mr. Thomas cannot establish a violation of substantive due process, despite his intentional and conscious confinement. *See Ortega*, 85 F.3d at 1526.

The final way that Mr. Thomas might establish a claim of § 1983 false imprisonment would be to show that a substantive due process violation occurred despite the valid arrest

14

because Mr. Thomas "protest[ed] the detention on the basis of misidentification." *Id.* In establishing protested misidentification as a potential way of showing false imprisonment, the Eleventh Circuit has noted the Supreme Court's holding that "[a]rresting officers and those responsible for maintaining custody of detainees are not constitutionally required 'to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.'" *Cannon*, 1 F.3d at 1562 (citing *Baker v. McCollan*, 443 U.S. 137, 146 (1979)). In light of this holding, the Eleventh Circuit has required "the lapse of a certain amount of time" and "continued detention in the face of repeated protests" to constitute a due process violation. *Id.*

Although the Court has not set out a particular amount of time that is "too long," it has repeatedly measured these time periods by counting *days*, not minutes or hours. *See Cannon*, 1 F.3d at 1562 (finding a potential due process violation where the officer held the misidentified detainee in jail for seven days without making any effort to determine her identity); *Douthit v. Jones*, 619 F.2d 527 (5th Cir. 1980) (finding a valid § 1983 claim where the plaintiff was detained for 30 days beyond the expiration of his sentence)[2].

In this case, Mr. Thomas did repeatedly protest his detention and assert his innocence, but he did so over a period of mere minutes, not days. He had not even arrived at any detention facility when Officer Steketee called to verify Mr. Thomas's identity and learned of the mistake. Once learning of the misidentification, Officer Steketee immediately sought counsel from his superiors and returned Mr. Thomas to the place of arrest, as they directed. The entire encounter

---

[2]*See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (adopting as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981).

could not have even lasted a full ninety minutes, given that the encounter began at 5:42 p.m. and Mr. Thomas called to make his complaint at 7:07 p.m. Under these circumstances, the court finds that no substantive due process violation occurred and that Mr. Thomas cannot maintain his claim. As such, the court will GRANT the motion for summary judgment as to Mr. Thomas's § 1983 false imprisonment claim against Officer Steketee.

As an alternative ruling, the court also finds that, if Officer Steketee's actions did rise to the level of a constitutional violation, Officer Steketee was acting within the scope of his discretionary authority; he did not violate a clearly established right; and his actions were not willful, malicious, fraudulent, in bad faith, beyond his authority, or made under a mistaken interpretation of the law. Therefore, he is entitled to qualified immunity as to this claim. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

### ii.     Section 1983 Claims against the City of Anniston

In Count Three Plaintiff alleges that the City of Anniston is liable under § 1983 for Officer Steketee's actions. Plaintiff alleges a variety of theories, claiming that Officer Steketee's actions were pursuant to "a pattern, policy or custom sanctioned by the City of Anniston" and that the City of Anniston "failed to properly supervise and train" Officer Steketee. (Doc. 1, ¶¶ 22, 25). Regardless of the specifics of Plaintiff's allegations, however, she cannot maintain a claim against the municipality where the court has already determined that the individual officer has inflicted no constitutional harm. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Therefore, the court will GRANT Defendants' motion for summary judgment as to Plaintiff's § 1983 claim against the City of Anniston.

16

### B.       Section 1985 Claims

Plaintiff cites 42 U.S.C. § 1985 in the first paragraph of her complaint, but never makes a specific allegation under the statue in any of her counts. Section 1985 protects against a conspiracy to interfere with civil rights. 42 U.S.C. § 1985. The first two subsections, titled "Preventing officer from performing duties" and "Obstructing justice; intimidating party, witness, or juror," are inapplicable to the facts of this case. 42 U.S.C. § 1985 (1)-(2). The only subsection under which Plaintiff could possibly bring a claim would be § 1985(3), entitled "Depriving persons of rights or privileges." 42 U.S.C. § 1985(3).

"The elements of a cause of action under § 1985(3) are: (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146-47 (11th Cir. 1996). The Eleventh Circuit has further noted that the second element "requires a showing of some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id*. at 1147 (internal quotations and citations omitted).

Plaintiff has not even alleged, much less provided evidence of, facts to support a conspiracy claim. As already established, no constitutional violation occurred and nothing in the allegations or the record indicate that the mistake in identity was a result of any class-based animus. The court will GRANT Defendants' motion for summary judgment as to Plaintiff's § 1985 claim.

17

C.      **Alabama State Law Claims**

The United States Supreme Court has noted that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  The Eleventh Circuit has also noted that "[t]he decisions to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004) (citation omitted).  Because the court is granting judgment against the Plaintiff as to all of her federal claims giving rise to original jurisdiction in this court, the court finds no basis upon which to allow the remaining state law claims to proceed and declines to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).[3] Therefore, the court will DISMISS the state law claims WITHOUT PREJUDICE.

V.      **CONCLUSION**

For these reasons, the court will DISMISS WITHOUT PREJUDICE Plaintiff's state law claims. The court finds that Defendants' motion for summary judgment is due to be GRANTED as to Plaintiff's federal claims. The court will ENTER JUDGMENT in favor of Defendants on Plaintiff's § 1983 and § 1985 claims. The court will DIRECT the Clerk of Court to close this case.

---

[3]In exercising its discretion, the court is aware of the Eleventh Circuit's admonition that "[i]f the state claim has become time-barred during the pendency of the federal action then the court should exercise supplemental jurisdiction despite the dismissal of all of the federal claims." *Ingram v. Sch. Bd. of Miami-Dade County*, 167 F. App'x 107, 109 (11th Cir. 2006) (citing *Eubanks v. Gerwen*, 40 F.3d 1157, 1162 (11th Cir. 1994)). Here, however, Plaintiff's claims are not yet time-barred under the six-year statute of limitations set forth in Alabama Code § 6-2-34(1).

DONE and ORDERED this 16th day of June, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE